CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 17 2018

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| ISRAEL COOPER, | ) | CASE NO. 7:17CV00509 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| LT. CHRISTOPHER GILBERT, et al, | ) | By: Hon. Glen E. Conrad |
| | ) | Senior United States District Judge |
| Defendant(s). | ) | |

Israel Cooper, a Virginia inmate proceeding pro se, filed this civil rights action pursuant

to 42 U.S.C. § 1983, alleging that the defendant prison officials deprived him of property and

liberty interests without due process. Upon review of the record, the court finds that the action

must be summarily dismissed without prejudice for failure to state a claim.

### Background

Cooper, an inmate at Red Onion State Prison, alleges the following sequence of events on

which he bases his claims. Cooper is classified as a Level S ("SLS") inmate and as such, he is

assigned to long-term administrative segregation. Under current policies, once a VDOC inmate

is classified as SLS, he may participate in the Segregation Reduction Step-Down Program set out

in Operating Procedure ("OP") 830.A. See OP 830.A, at 17-32, ECF No. 1-1. The step-down

program provides "established procedures for incentive based offender management which . . .

create[s] a pathway for offenders to step-down from Security level S to lower security levels in a

manner that maintains public, staff and offender safety." OP 830.A(I). Each SLS inmate is

assessed and assigned to the appropriate privilege level: intensive management ("IM"), special

management ("SM"), or the reentry unit. Within the assigned pathway, the inmates are further

sub-classified under OP 830.A as follows, from IM-0 or SM-0 as the most restrictive statuses, to

Security Level 5 General Population as the least restrictive:

Intensive Management (IM):
IM-0
IM-1
IM-2
IM-SL6
Special Management (SM):
SM-0
SM-1
SM-2
SM-SL6 (Security Level 6)
Step-Down—Level 6 General Population
Structured Living—Phase 1 and Phase 2
Security Level 5 General Population

The step-down program requires the inmate to complete a seven workbook set called the

Challenge Series, remain infraction free, exhibit responsible behavior, and participate in self-

improvement and education programs. When an SM-0 inmate makes sufficient progress toward

the goals of that step, he will be advanced to SM-1 or SM-2, where he will be permitted

additional privileges, including use of electronics and the chance to apply for an in-pod job. An

SM-1 or SM-2 inmate who does not meet the standards for discipline, responsible behavior, self-

improvement, and programming can be moved back to SM-1 or SM-0. There he will remain,

stripped of the higher privileges of his prior step until he completes the goals to be advanced

once again. These classification adjustments are regularly reviewed and adjusted by various staff

assessment teams, with a formal review hearing every 90 days, and an annual review of the

inmate's progress and appropriate classification status.

All SLS inmates in the IM and SM categories are housed in single cells. When any SLS

inmate leaves his cell, he must be restrained in handcuffs and shackles. In full restraints, he is

then escorted by two officers at all times to recreation, to the shower, or to medical

appointments. Outdoor recreation consists of being locked in a fenced area to walk or do calisthenics. When the SM inmate completes the Challenge Series and meets the goals for SM-2, he may be assigned to SL6, where he can progress to unrestrained movement outside his cell, having a cellmate, and having outside recreation and dining hall meals with other inmates. If the inmate completes the goals in SL6, he may then be reduced to Security Level 5 and be placed in a general population setting.

Cooper complains that during a December 2016 status review proceeding, defendants Gilbert, Duncan, and Gallihar relied on a recent disciplinary charge as a basis for reducing Cooper from SM-2 to SM-1, although no disciplinary hearing had yet occurred. Cooper contends that at SM-2, he was "within weeks" of being released from long-term segregation. Compl. 4, ECF No. 1. Reduction to SM-1 required him to redo the Challenge Series and spend six more months in long-term segregation. Cooper complains that he did not receive advance notice or any paperwork about the reduction to SM-1, which prevented him from appealing. Duncan responded to Cooper's informal complaint, stating that OP 830.A does not require such procedures for changes in privilege levels. Defendant Messer compounded this alleged policy violation by stating in response to Cooper's grievance that "privilege levels are non-grievable." Id. at 7. Cooper asserts that defendants Kiser and Artrip violated policy and due process when they continued holding Cooper in long-term segregation even after he completed all the required books on July 5, 2017. He complains that all of the defendants have failed to provide the level of procedural protection during the status review process that OP 830.A and other VDOC regulations require, and that Messer has denied him access to the grievance procedures. Finally,

Cooper contends that the defendants have refused to transfer him from SLS back to the protective custody unit,[1] even though he cannot return to the general population for safety reasons.

Cooper raises a separate claim that officials have wrongfully deprived him of property. He alleges that on July 22, 2017, defendants Looney Deel were floor officers. Cooper placed outside his door a large manila envelope containing legal mail, with an attached yellow money withdrawal slip for the sergeant to sign to pay for postage. The package disappeared. Cooper filed an informal complaint the next day, saying that no one would tell him where his package was. Kiser responded on August 8 that Cooper should have given his legal package to proper authorities, because when placed outside his door, it might be mistaken for trash. In response to Cooper's grievance, Artrip reported that per investigation, Looney stated that "Cooper asked to drop trash out" and that no evidence suggested the item was anything other than trash. Id. at 8.

## Discussion

Under 42 U.S.C. § 1997e(c)(1), the court may dismiss any § 1983 action "with respect to prison conditions . . . if the court is satisfied that the action is frivolous, malicious, [or] fails to state a claim upon which relief can be granted." A "frivolous" claim is one that "lacks an arguable basis either in law or in fact," because it is "based on an indisputably meritless legal theory" or on "factual contentions [which] are clearly baseless." Neitzke v. Williams, 490 U.S. 319, 325, 327 (1989) (interpreting "frivolous" in former version of 28 U.S.C. § 1915(d)). An inmate's complaint may be summarily dismissed under this section if it fails to allege "enough facts to state a claim to relief that is plausible on its face." Giarratano v. Johnson, 521 F.3d 298,

---

[1] Cooper states that while he was assigned to the protective custody unit, officials found a weapon in his cell; when neither he nor his cell mate claimed it, both were charged with a disciplinary infraction. Based on that charge, Cooper was transferred to long-term segregation.

302 (4th Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In determining whether the complaint states a claim, a court must view the factual allegations in the light most favorable to the plaintiff, but "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarrantano, 521 F.3d at 302 (omitting internal quotations).

To state a cause of action under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted). The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation,[2] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Cooper does not have an inherent, constitutionally protected liberty interest in avoiding particular living conditions, even punitive ones. Wolff v. McDonnell, 418 U.S. 539, 556-57 (1974). ("[T]he interest of prisoners in disciplinary procedures is not

---

[2] To the extent that Cooper claims defendants have violated his substantive due process rights, his claim fails. It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." Whitley v. Albers, 475 U.S. 312, 327 (1986).

included in that 'liberty' protected by the Fourteenth Amendment."). A state-created liberty interest may exist, however, if Cooper (a) points to "a basis for an interest or expectation in state regulations" in avoiding a particular set of living conditions, Prieto, 780 F.3d at 250; and (b) shows that the living conditions "impose[d] atypical and significant hardship . . . in relation to the ordinary incidents of prison life," or will "inevitably affect the duration" of his confinement. Sandin v. Connor, 515 U.S. 472, 484, 487 (1995). Only if Cooper makes these showings does the Due Process Clause require a particular measure of procedural protection. Id.

Cooper alleges that defendants wrongfully lengthened his confinement in SLS and interfered with his progress in the step-down program without sufficient procedural due process protections. Cooper claims that he did not receive appropriate notice, the ability to present documentation and witnesses, or a detailed and/or written statement of the reasons for classification decisions. Cooper is missing the critical ingredient for his due process claims concerning classification proceedings, however: he provides no facts showing that he had a constitutionally protected liberty interest at stake.

A state prison's policy requiring periodic classification reviews for segregation inmates can create a potential liberty interest. See, e.g., Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2016). This court has held that the VDOC's policy requiring periodic reviews of each SLS inmate's classification status creates a liberty interest in avoiding the SLS classification, its conditions and restrictions. See, e.g., Delk v. Younce, No. 7:14CV00643, 2016 WL 1298389, at *6 (W.D. Va. Mar. 31, 2016) (Moon, J.). Cooper's liberty interest related to SLS and its steps can only warrant constitutional procedural protection, however, if his continued confinement in SLS imposes "atypical and significant hardship" compared to the "ordinary incidents of prison

life." Sandin, 515 U.S. at 484. This court has previously rejected precisely this claim. See, e.g., Muhammad v. Mathena, No. 7:14cv00529, 2017 WL 395225 (W.D. Va. Jan. 27, 2017) (finding no constitutionally protected liberty interest in avoiding SLS status or any particular step status under Red Onion's step-down procedures) (Conrad, J.); DePaola v. Va. Dep't of Corr., No. 7:14cv00692, 2016 WL 5415903 (W.D. Va. Sept. 28, 2016) (same) (Jones, J.). Based on the reasoning in these decisions, the court concludes that Cooper has not shown a constitutionally protected liberty interest in avoiding SLS status or any of its steps. Specifically, the court concludes that the step-down procedures available to SLS inmates address and alleviate the isolating conditions and indefiniteness identified in Wilkinson and Incumaa as distinguishing factors of "atypical and significant" hardships in a long-term segregation scheme.

Furthermore, Cooper's submissions do not indicate that his position on the SM pathway has any inevitable effect on the length of his confinement so as to trigger a constitutionally protected liberty interest. Sandin, 515 U.S. at 487. Nothing in the SLS policies before the court indicates that assignment to this status terminates an inmate's eligibility to earn good conduct time.

For the reasons stated, the court finds that Cooper has failed to present facts showing that he has a constitutionally protected liberty interest in avoiding classification to SLS or assignment or reassignment to a particular privilege level under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification assignment and review proceedings. Sandin, 515 U.S. at 486-87.

Cooper also has no claim under § 1983 that any of the defendants have misconstrued or misapplied VDOC classification procedures or that procedures during pathway or step assignments and reviews are inconsistent with other VDOC policies. These alleged violations of state procedural regulations do not present a federal due process issue and are, therefore, not actionable under § 1983. Riccio v. County of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir.1990). Accordingly, the court will dismiss all of Cooper's claims that the defendants have deprived him of privileges or statuses in the step down program without due process.

Finally, the court finds no actionable § 1983 claim regarding the alleged loss and destruction of Cooper's legal materials on July 22, 2017. Cooper claims that officials randomly destroyed legal mail he placed outside his door. Allegations that prison officials randomly deprived an inmate of his property, whether intentionally or as a result of negligence, do not state any constitutional claim "if a meaningful post-deprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). Inasmuch as Cooper possessed tort remedies under Virginia state law to recover the monetary value of the lost mail, see Va. Code Ann. § 8.01-195.3, it is clear that he cannot prevail in a constitutional claim for the alleged property loss in this case. Hudson, 468 U.S. at 533. Because he fails to show how deprivation of any of his property items caused actual injury to any litigation efforts, his complaint also states no actionable claim that the defendants' alleged misdeeds violated his right to access the courts. See Lewis v. Casey, 518 U.S. 343, 351-53 (1996).

## Conclusion

For the stated reasons, the court summarily dismisses the entire action without prejudice, pursuant to 42 U.S.C. § 1997e(c)(1), for failure to state a claim upon which relief can be granted.

8

As the complaint was thus deficient at the outset, the court will dismiss as moot Cooper's motion

to amend to add defendants and his motion for preliminary injunction.[3] An appropriate order

will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying

order to plaintiff.

ENTER: This 17th day of April, 2018.

_____
Senior United States District Judge

---

[3] In any event, Cooper's motion for preliminary injunctive relief fails on the merits. He complains that unnamed officials threw away some of his property and legal materials with no stated consequence to his litigation efforts, and that others have threatened to harm him if he continues to file "paperwork." Pl.'s Mot. 1, ECF No. 10. These complaints do not relate to the underlying defendants or claims in this action and do not show any likelihood that Cooper will suffer imminent and irreparable harm in the absence of the requested court intervention. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).